Sam Martin
DELLI BOVI AND MARTIN, LLC
30 W. 14th St. Ste. 204
Helena, MT 59601
(406) 438-6143
sam@sammartinlaw.com

Jessica Christy
CHRISTY LAW LLC
2055 S. Oneida St., Ste. 394
Denver, CO 80224
(720) 729-7841
jessica@christylaw.legal
*Pro hac vice application pending*

Brian Ertz
ERTZ LAW, PLLC
Post Office Box 665
Boise, ID 83701
(208) 918-1663
(208) 545-9770
brian@ertzlaw.org
*Pro hac vice application forthcoming*

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MONTANA
## BUTTE DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, NATIVE ECOSYSTEMS COUNCIL | ) ) ) Case No. |
| *Plaintiffs,* | ) ) |
| DEB HAALAND, in her official capacity as Secretary of the Department of the Interior; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; SONYA GERMANN, in her official capacity as | ) ) ) ) ) **COMPLAINT FOR** **DECLARATORY** |

| Montana-Dakotas State Director at the Bureau of Land Management; LINDSEY BABCOCK, in her official capacity as Field Manager of the Butte Field Office, Bureau of Land Management; and UNNAMED AUTHORIZED OFFICER, who signed the Finding of No Significant Impact and Decision Record, | ) ) ) ) ) ) ) ) ) | **AND INJUNCTIVE RELIEF** (42 U.S.C. § 4321 et seq.; 43 U.S.C. § 1701; 5 U.S.C. App. 2; 5 U.S.C. §§ 701-706) |
| *Defendants.* | ) | |

## INTRODUCTION

1.      Plaintiffs Alliance for the Wild Rockies and Native Ecosystems Council ("Plaintiffs") bring this action for declaratory and injunctive relief against federal Defendants Bureau of Land Management ("BLM" or the "Agency") and the United States Department of the Interior ("DOI") for its final actions in violation of law, pertaining to the Recreation Area Management Plan (the "Plan") for the Scratchgravel Hills Special Recreation Management Area ("Scratchgravel").

2.      This action challenges the Scratchgravel Hills Recreation Area Management Plan Decision Notice (the "Decision") signed by an unnamed "Authorized Officer" March 9, 2022; the associated Preliminary and Final Environmental Assessments ("Draft EA" and "EA" respectively), released by BLM on March 9, 2022; and the Finding of No Significant Impact ("FONSI") signed by an unnamed "Authorized Officer" March 9, 2022 (collectively, the

*Alliance for the Wild Rockies et al. v. Haaland et al.*

"Scratchgravel Plan"). Plaintiffs bring this case under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4332; the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. § 1701 *et seq.*; the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*; and the Federal Advisory Committee Act, 5 U.S.C. App 2.

3. BLM notes that the Scratchgravel Plan is needed "to reduce future conflicts and resource impacts by providing a trail system that can accommodate and support the current and anticipated future level of recreational use in this area" and was spurred by "a detailed proposal (submitted by GDP Consulting for a group of 38 individuals consisting of area hikers, trail runners, equestrians, dog walkers, disc golfers, and mountain bikers) . . . asking BLM to consider constructing new trails within the [Scratchgravel area] to improve the area's recreational opportunities and experiences for hikers, bikers, equestrians, and disc-golfers". EA at 5. BLM did not release the proposal it received in 2017 as part of its project file, but did release the proposal submitted during the comment phase of this decision ("GDP Proposal"). GDP's Proposal is strikingly similar to the initial and final proposal submitted by BLM, particularly as it pertains to the actual trail locations and analysis language.

4. The Scratchgravel Plan makes land use decisions for approximately 5,500 acres of BLM managed land, located approximately five miles northwest of

*Alliance for the Wild Rockies et al. v. Haaland et al.*

Helena, Montana, EA at 4. According to the EA, the Project will make trailhead improvements; reduce the number of miles of existing interior trails/primitive roads (those reserved for foot and horse traffic) from 36 miles to 27 miles; create 35 miles of "new traditional mountain bike-optimized trails," which will largely allow foot, bike, and horse traffic, EA at 28-29. As shown in Figure 1, the design of the new trails includes a significant amount of overlapping bike and equestrian trails.

5.      Motions for a Temporary Restraining Order and a Preliminary Injunction will be forthcoming shortly.

**Figure 1. Map of Scratchgravel Proposal**







*Alliance for the Wild Rockies et al. v. Haaland et al.*

6. The Scratchgravel Plan is scant on analysis, apparently having wholesale adopted the GDP Proposal and much of its underlying analyses and conclusions, making it woefully deficient in its obligations to ensure sound, informed, and transparent decision-making.

7. The GDP Proposal states it incorporates interviews with over 130 people across a wide range of recreational users and consulted with biologists from BLM and Montana Fish, Wildlife, and Parks. Pp. 3, 9. The only user conflicts identified from these interviews pertained to dog interactions and shooting zones. Pp. 10-11. These were the only safety impacts BLM identified during the scoping period. EA at 18.

8. Rather than engage in a lawful decision-making process, BLM has chosen to elevate mountain bike riders above other recreational groups, in violation of its multiuse mandate. Further, when BLM does engage in analysis, it largely fails to rely on the complete set of information available to it, employs incorrect and arbitrary assumptions, and outright ignores important issues and agency guidance.

## JURISDICTION, RIGHT OF ACTION AND VENUE

9. Jurisdiction is proper in this Court under 28 U.S.C. § 1346 because the United States is a defendant and 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the laws of the United States,

including the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*; the

National Forest Management Act, 16 U.S.C. § 1601 *et seq.*; the Administrative

Procedure Act, 5 U.S.C. § 701 *et seq.* ("APA"); the Declaratory Judgment Act, 28

U.S.C. § 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. § 2412 *et*

*seq.* Jurisdiction is also proper under 28 U.S.C. § 1361 (actions to compel an

officer of the United States to perform his or her duty).

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because

this is a civil action in which officers or employees of the United States or an

agency thereof are acting in their official capacity or under color of legal authority,

all or a substantial part of the events or omissions giving rise to the claims herein

occurred within this judicial district, and the affected public lands and resources

are located in this judicial district.

11.     An actual, justiciable controversy now exists between Plaintiffs and

Defendants within the meaning of 28 U.S.C. § 2201 and Plaintiffs are entitled to

the relief sought herein to redress the harm Plaintiffs would otherwise suffer.

Although the Decision was issued in March of 2022, mountain biking groups have

already created jumps and unauthorized paths. The requested relief is therefore

proper under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 701-06.

12.     Plaintiffs have exhausted all required administrative remedies prior to

bringing this action, by submitting comments during the comment period and filing

formal objections to the EA and FONSI within the required timeframe pursuant to 36 C.F.R. Part 218.

13. Plaintiffs have no adequate remedy at law.

14. The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

15. Plaintiff ALLIANCE FOR THE WILD ROCKIES ("Alliance") is a tax-exempt, nonprofit public interest organization dedicated to the protection and preservation of the native biodiversity of the Northern Rockies Bioregion, its native plant, fish, and animal life, and its naturally functioning ecosystems. Its registered office is located in Missoula, Montana. The Alliance has over 2,000 individual members, many of whom are located in Montana in close proximity to Scratchgravel. Members of the Alliance observe, enjoy, and appreciate Montana's native wildlife, water quality, and terrestrial habitat quality, and expect to continue to do so in the future, including in the Scratchgravel Hills area. Alliance's members' professional and recreational activities are directly affected by Defendants' failure to perform their lawful duty act within the law and to protect and conserve these ecosystems as set forth below. The Alliance brings this action on its own behalf and on behalf of its adversely affected members.

16.    Plaintiff NATIVE ECOSYSTEMS COUNCIL ("NEC") is a non-profit corporation. NEC is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Scratchgravel area for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. BLM's unlawful actions adversely affect NEC's organizational interests, as well as its members' use and enjoyment of the Scratchgravel area. NEC brings this action on its own behalf and on behalf of its adversely affected members.

17.    Members of the Plaintiff organizations reside near, visit, or otherwise use and enjoy the Scratchgravel Hills area, including on horseback. Members of the Plaintiff organizations use lands throughout the project area for recreation, wildlife viewing, photography, education, and aesthetic and spiritual enjoyment, including on horseback. The Plaintiffs and their members derive scientific, recreational, aesthetic, and conservation benefits and enjoyment from their use of the area.

18.    Plaintiffs have participated in every step of the administrative process for the Scratchgravel Plan. Plaintiffs submitted comments during the scoping (Alliance & NEC signed comments dated September 10, 2020, and October 5, 2020), and project phases (Alliance submitted two sets of comments, dated September 10, 2021 and September 17, 2021). Once the Project was finalized,

*Alliance for the Wild Rockies et al. v. Haaland et al.*

9

Plaintiffs timely filed an appeal, accompanied by a Petition for Stay, dated April 6, 2022. BLM opposed the appeal, and the Interior Board of Land Appeals denied the stay on May 18, 2022, Order, DOI-BLM-B070-2018-0008-EA (May 18, 2022); and the appeal was withdrawn on July 1, 2022.

19.    Defendant DEB HAALAND is the Secretary of the Department of the Interior and is being sued in her official capacity.

20.    Defendant TRACY STONE-MANNING is the Director of the Bureau of Land Management and is being sued in her official capacity.

21.    Defendant THERESA HANLEY is the Montana-Dakotas State Director at the Bureau of Land Management and is being sued in her official capacity.

22.    Defendant LINDSEY BABCOCK is the Field Manager of the Butte Field Office within the Bureau of Land Management and is being sued in her official capacity.

23.    Defendant, UNNAMED AUTHORIZED OFFICER, who signed the Finding of No Significant Impact (FONSI) and Decision Record is being sued in their official capacity.

## PLAINTIFF'S MEMBERS USE OF THE SCRATCHGRAVEL AREA

24.    The Scratchgravel area has been used by hikers, equestrians, bikers, and disc golfers since before it was designated as a recreation area in 1984. Many

of the existing trails are remnants of mining and four-wheel drive trails, which were created prior to the exclusion of off highway vehicles from the area in 2009.

25.     Many equestrians are attracted to and purchase homes in the surrounding area due to the easy access to the trails and larger lot divisions that were intended to be horse properties. Scratchgravel provides a unique experience to equestrians because of the varied terrain, which is good both for seasoning and educating young horses and riders and providing a challenge for more experienced riders. Scratchgravel is one of the last remaining places close to the city of Helena that allows equestrian use (the Mount Helena Trail System, South Hills Trail System, Davis Gulch, and Beattie St. Trailhead are a few examples of areas recently closed to horses) and horseback riders are increasingly being pushed out of Scratchgravel by aggressive and/or distracted mountain bikers who create extreme safety risks for horses and riders.

26.     Scratchgravel is also home to many unique plants and animals and Plaintiff's members currently enjoy spotting the varied wildlife such as elk, deer, pica, hawks, eagles, pinon jays, grouse, jack rabbits, meadowlarks, coyotes, and foxes from their homes as well as on the trails. Plaintiff's members are concerned that Plan's design to significantly increase the amount of activity here, specifically including the tree cutting that will accompany it, will drive wildlife out of this area, as well as exacerbate impacts from beetle kill.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

27.     Plaintiff's members are also extremely concerned about the damage some bikers are already causing to the area and the BLM is providing tacit permission for this by refusing to acknowledge the problems here.

## PROCEDURAL HISTORY

28.     At some point in 2017, BLM received a proposal from GDP Consulting, laying out a plan for the Scratchgravel area. EA at 5. On March 20, 2018, BLM posted the Scratchgravel Plan in the NEPA Register on BLM's e-planning website, announcing the formal scoping period dates of March 20, 2018, to May 1, 2018. BLM received 120 scoping comments most of which the Agency claims "were in support of the overall project," including a "detailed proposal from GDP Consulting and other members of the public." EA at 7. BLM notes a "small number of comments voiced opposition to the proposal due to concerns related to recreation opportunities and experiences, travel management, access, private property, wildlife, soils, and weeds." *Id.*

29.     BLM issued the Draft EA on June 16, 2021, and the formal comment period took place from June 24, 2020, until October 6, 2020. During this comment period, BLM received 650 comments from "various recreation user groups and general members of the public." EA at 7. The Draft EA included a "no action" alternative and one proposed alternative for Scratchgravel.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

30.     On March 6, 2022, BLM issued its Decision, along with a final EA and FONSI. In addition to the "no action" and proposed alternative, the final EA contained a logical outgrowth proposal, which BLM selected.

31.     Plaintiffs filed an appeal on March 9, 2022, arguing the project would harm their members due to impacts to wildlife, enjoyment of the area, and safety concerns, based on BLM's wholly inadequate NEPA analysis, and requested a stay of the project. The appeal was denied on May 18, 2022.

## LAND USE DECISIONMAKING

32.     BLM must comply with the statutory requirements in the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), the Administrative Procedure Act ("APA"), and the Federal Advisory Committee Act ("FACA"), along with the regulations promulgated thereunder. BLM's land use planning and decision-making are also informed by various guidance documents, which it drafts in response to its obligations under these various statutes.

33.     As it pertains to land use planning, BLM is empowered to make large-scale land use decisions through the creation of a resource management plan ("Resource Plan") which then provides management guidance for smaller-scale decisions about land use through, among other avenues, development of a special management recreation area plan ("Area Plan"). Planning for Recreation and

Visitor Services, BLM Handbook H-8320-1 at I-6 (Aug. 22, 2014) ("Recreation Handbook") ("Land use planning decisions are usually made on a broad scale and customarily guide subsequent-specific implementation decisions.").

34.     Area Plans, such as the Scratchgravel Plan, provide "specific direction for on-the-ground implementation of the [Resource Plan] over a discrete management unit" and provides specific topics the Area Plan must address, including relating to "management, administration, information and education, and monitoring." Recreation Handbook at I-11.

## The National Environmental Policy Act ("NEPA")

35.     NEPA is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

36.     NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare of" all people, and (3) "encourage productive and enjoyable harmony" between humankind and the environment. 42 U.S.C. § 4321. NEPA recognizes that "each person should enjoy a healthful environment" and ensures that the federal government uses all practicable means to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations" and "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." *Id.* at § 4331(b)-(c).

37.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

38.     NEPA is designed to ensure that federal agencies thoroughly evaluate the potential environmental impacts of and reasonable alternatives to proposed actions *before* making a commitment of federal resources. The NEPA review must "serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made." *Id.* at § 1502.2(g); see also *id.* at § 1502.5; 32 C.F.R. pt. 651, app. E, § (a)(4). BLM is permitted to rely on existing analyses prepared under NEPA only if "the Responsible Official determines, ***with appropriate supporting documentation***, that it adequately assesses the environmental effects of the proposed action and reasonable alternatives. The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not

previously analyzed may result in significantly different environmental effects." 43 C.F.R. § 46.120(c) (emphasis supplied).

39.     In evaluating reasonably foreseeable effects, an agency must disclose incomplete, unavailable, or lacking information and either procure the information or include a statement detailing (1) that such information is incomplete or unavailable, (2) a statement of the information's relevance, (3) a summary of existing alternative credible scientific evidence, and (4) the agency's evaluation of impacts. 40 C.F.R. § 1502.22. BLM's own regulations state when the agency is missing data, it must "consider all costs to obtain information." 43 C.F.R. § 46.125. Federal agencies must "ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents" and "shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement, but "are not required to undertake new scientific and technical research to inform their analyses." 40 C.F.R. § 1502.23.

40.     BLM's regulations promulgated under NEPA address consensus-based management, which "incorporates direct community involvement in consideration of bureau activities subject to NEPA analysis, from initial scoping to implementation of the bureau decision," and the "Responsible Official must, whenever practicable, use a consensus-based management approach to the NEPA

process." 43 C.F.R. § 46.110(a) & (c). The consensus-based approach must comply with FACA. *Id.* § 46.110(e).

## The Administrative Procedure Act ("APA")

41.    The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Final agency actions "for which there is no other adequate remedy in a court" are reviewable under the APA. *Id.* at § 704.

42.    Courts must find agency action unlawful if it is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action is "without observance of procedure required by law." *Id.* at § 706(2)(A) & (D). Courts will also set aside agency action that contradicts an agency's prior position when it fails to "show that there are good reasons for the new policy. *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,* 567 U.S. 239, 250 (2012).

## Federal Land Policy and Management Act of 1976 ("FLPMA")

43.    FLPMA, BLM's organic act, directs the agency to manage public lands "on the basis of multiple use," 43 U.S.C. § 1701(a)(7); "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will

provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use," *id.* § 1701(a)(8).

44.     Multiple use is defined as "management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output." 43 U.S.C. § 1702(c).

45.     FLPMA also emphasizes the importance of public participation, stating that the BLM shall establish procedures "to give the public adequate notice

and an opportunity . . . to participate in the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e).

## Federal Advisory Committee Act ("FACA")

46. Under FACA, no advisory committee shall be established by a federal agency unless such establishment is "determined as a matter of formal record, by the head of the agency involved after consultation with the Administrator [of General Services] with timely notice published in the Federal Register, to be in the public interest in connection with the performance of duties imposed on that agency by law." 5 U.S.C. App. 2 §9(a)(2).

47. Further, no advisory committee shall "meet or take any action until an advisory committee charter has been filed … with the head of the agency to whom any advisory committee reports and with the standing committees of the Senate and House of Representatives have legislative jurisdiction of such agency." 5 U.S.C. App. 2, § 9(c).

48. The term "advisory committee" means "any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof . . . which is- . . . established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for" the agency. 5 U.S.C. App. 2 §3(2).

49.     BLM may formally employ advisory committees on matters relating to public lands and resources, so long as the members have no direct interest in the outcome of the issue being advised upon, its meetings are announced and open to the public, and membership is balanced, particularly as it pertains to points of view. 43 C.F.R. § 1784, *et seq.*

50.     Agency heads or other federal officials creating an advisory committee shall "require the membership of the advisory committee to be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee." 5 U.S.C. App. 2, § 5(b)(2), (c).

51.     Advisory committees must meet certain prescribed requirements and follow certain prescribed procedures, including:

(1)     Each advisory committee meeting shall be open to the public.

(2)     Timely notice of each such meeting shall be published in the Federal Register, and the Administrator shall prescribe regulations to provide for other types of public notice to insure that all persons are notified of such meeting prior thereto.

(3)     Interested persons shall be permitted to attend, appear before, or file statements with any advisory committee, subject to such reasonable rules or regulations as the Administrator [of General Services] may prescribe

(4)     Subject to section 552 of title 5, United States Code, the records, reports, transcripts, minutes, appendices, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

(5)     Detailed minutes of each meeting of each advisory committee shall be kept and shall contain a record of the persons present, a complete and accurate description of the matters discussed and conclusions reached, and copies of all reports received, issued, or approved by the advisory committee. The accuracy of all minutes shall be certified to by the chairman of the advisory committee.

(6)     There shall be a designated officer or employee of the Federal Government to chair or attend each meeting of each advisory committee. No advisory committee shall conduct any meeting in the absence of that officer or employee.

(7)     Advisory committees shall not hold any meetings except at the call of, or with the advance approval of, a designated officer or employee of the federal government, and with an agenda approved by such officer or employee. 5 U.S.C. App. 2, § 10.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

## The Administrative Procedure Act ("APA")

52.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Final agency actions "for which there is no other adequate remedy in a court" are reviewable under the APA. Id. at § 704.

53.     Courts must find agency action unlawful if it is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action is "without observance of procedure required by law." Id. at § 706(2)(A) & (D).

## Decisionmaking Guidance and Agency Application

54.     When making land use decisions involving planning on multiple scales, BLM is permitted to tier its analysis through these levels of planning to avoid duplication, but the agency must still conduct the proper analysis at the Area Plan level in the absence of appropriate guidance at the Resource Plan level. 43 C.F.R. § 46.140(b) ("To the extent that any relevant analysis in the broader NEPA document is not sufficiently comprehensive or adequate to support further decisions, the tiered NEPA document must explain this and provide any necessary analysis."). "An environmental assessment must contain objective analyses that support conclusions concerning environmental impacts." 43 C.F.R. § 46.310(g).

55.     BLM has developed a number of other documents which inform its planning process, including handbooks and manuals to guide specific facets of its decisionmaking. *See e.g.* Recreation Planning Handbook at I-1 ("The purpose of this handbook is to assist in the planning and management of recreation and visitor services (R&VS) on public lands and adjacent waters. This handbook provides planning guidance at the [Resource Plan] and implementation level."); Planning for Recreation and Visitor Services Manual at .01, BLM (Mar. 29, 2011) ("Recreation Manual") ("This manual section provides the Bureau of Land Management (BLM) policy, direction, and guidance for planning for recreation resources as part of the land use planning process required under BLM Manual section 1601 - Land Use Planning.").

*Resource Plan*

56.     On April 20, 2009, BLM released its Record of Decision ("Butte ROD") and Approved Butte Resource Management Plan ("Butte Plan"), "a comprehensive land use plan to guide management of public lands administered by the Butte Field Office." Butte Plan at 7. The Butte Plan includes specific standards for decisions in subsequent Area Plans for travel management, wildlife, and soils management, and also identifies gaps in its data.

57.     The Helena Travel Planning Area part of the Butte Plan focused on the Scratchgravel Hills area, where, due to "high degree of user conflicts . . .

between motorized and non-motorized use," BLM decided to close "public wheeled motorized travel" with a few exceptions. Butte Plan at 5; Butte ROD at 42. "The purpose of site-specific travel planning is to develop travel plans that meet the needs of public and administrative access . . . and minimize user conflicts and natural resource impacts associated with roads and trails . . . ." *Id.*

58.     BLM states the Scratchgravel Plan "would continue to be managed under the current travel plan, guidelines, rules and regulations." EA at 12. The agency addresses concerns about the route density and placement by stating that "BLM need not acquire new data regarding trail usage for this EA, rather the BLM's existing route and use information is sufficient," EA at 151. BLM does not address how it decided where the new trails would go or the appropriate density for those trails and why it could forego the analysis laid out in the Butte Plan.

59.     BLM's "Designation Criteria" requires trails be located to minimize "damage to soil, watershed, vegetation, air, and other resources of the public lands, and to prevent impairment of wilderness suitability"; harassment of wildlife or significant disruption of wildlife habitats"; and conflicts between users. 43 C.F.R. § 8342.1. To accomplish this, the Butte Plan lays out a procedure for evaluating whether the trail will have a low, medium, or high impact on wildlife, soils, and other resource evaluation criteria. Route setting must follow a specific procedure for analysis. Butte Plan at App'x D pp. 149-53.

60.     Rather than conduct a proper route analysis, BLM makes broad conclusions about impacts to wildlife, EA at 9-10; broadly concludes that "BLM's Interdisciplinary Team was generally able to determine that the proposed trail system" complies with the Designation Criteria, EA at 27, 45-49; and adopts a wait and see approach to soils management, EA at 31.

61.     The Butte Plan specifically requires BLM to consider wildlife corridors that exist "between the Greater Yellowstone Ecosystem and the Northern Continental Divide Ecosystem." *Id.* at 247-252. Further, BLM manages 8,000 acres of land within the greater Butte Plan that is identified grizzly bear habitat, including the Boulder Mountain range providing a secondary corridor between these two areas. *Id.* at 254. The Butte plan notes that for new trail construction in grizzly bear habitat areas, BLM **must** go through the standard consultation process, including completing a programmatic assessment sheet. *Id.* at App'x C pp. 124, 137-38.

62.     Rather, BLM notes that Scratchgravel is located within the "may be present" map for grizzly bear habitat, but concludes "grizzly bear presence is unexpected." EA at 9-10.

63.     Additionally, in the fall of 2018, Montana Fish, Wildlife and Parks ("MT DFWP") provided data and information regarding wildlife use of the Scratchgravel and in its April 13, 2018, comment letter, "specifically discussed elk

*Alliance for the Wild Rockies et al. v. Haaland et al.*

use of the area as winter range" and thus, the Draft EA "should specifically recognize recreational impacts on wildlife." MT DFWP Comment Letter (Nov. 12, 2020). It concludes that Scratchgravel "are within functional and utilized elk winter range" and "are the largest block of intact and undeveloped land in the Helena Valley." *Id.*

64.     BLM addresses the concerns about winter range by stating that Scratchgravel "provides a refuge and remnants of habitat for big game wildlife species" and "suppl[ies] limited winter habitat." EA at 46.

65.     The Butte Plan describes of the soils at Scratchgravel as "[m]ost are highly erodible and several series are very shallow." *Id.* at 284. BLM's plan for addressing this is to "inspect specific flagged routes prior to construction activities breaking ground to ensure that construction methods and trail locations incorporate site-specific soil concerns." EA at 31.

66.     When evaluating impacts, BLM is directed to consider the impacts of the effects of the Plan for the short-term (effects lasting less than 5 years), the mid-term (effects lasting 5-10 years), and long-term (effects lasting more than 10 years). *Id.* at 324. BLM cannot evaluate these impacts because it has no timeline for completion of the project as the "trail system would be completed in phases, as partnerships and/or funding becomes available." EA at 4. Because it has no plan for obtaining the funding, BLM is failing to consider the impacts to other users

while it piecemeal completes the newer trail system and how it will exclude

mountain bikers from the existing trails once they are riddled with bike features, as

is currently ongoing.

67. Lastly, the Butte Plan notes "Route safety data" is "incomplete or

substantially lacking." *Id.* at 325.

*Public Engagement*

68. In addition to the public engagement requirements of NEPA and

FLPMA, BLM must "notify the public and provide opportunities for public

involvement ***appropriate to the areas and people involved***," including during

scoping. 43 C.F.R. § 1610.2-1.

69. Generally, the data about user experiences and desired outcomes

would be collected at a small group discussion or a scoping meeting, using

questionnaires and surveys, where responses are documented. Recreation

Handbook at I-19 to I-23. Here, BLM did not directly engage with the public to

determine the desired user outcomes and instead relied on the GDP Proposal's

conclusions.

70. Here, BLM describes the steps it took to engage with the public as

providing an opportunity for scoping comments and providing an opportunity for

formal comments. EA at 7. BLM detailed no specific community outreach for

Scratchgravel and instead appears to have relied on the data provided in the GDP Proposal to determine the project scope and needs.

*Data Collection and Usage*

71.     Federal agencies must "ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents" and "shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement, but "are not required to undertake new scientific and technical research to inform their analyses." 40 C.F.R. § 1502.23. BLM specifically must arrange for "institutional data and information to be collected or assembled if already available." 43 C.F.R. 1610.4-3.

72.     "Collecting and analyzing data and performing recreation inventories ***are essential*** to recreation planning, implementation, monitoring, and evaluation. Data provide a necessary foundation to yield quality recreation opportunities. . . . [T]he outdoor recreation planner requires data on [recreation setting characteristics], outcomes, and use levels. . . . Data assembled to support all planning phases must be sufficient to address the nature and complexity of existing and potential issues or concerns. It is generally unnecessary to collect detailed, site-specific recreation-related data for the entire planning area. It is necessary to collect site-specific data for areas that are currently designated or have the

potential to be designated as RMAs, areas that have high use, or where use/user issues exist" Recreation Handbook at I-14 to -15 (emphasis supplied).

73.     "Inventories, assessments, and monitoring records and other forms of data collection should be used to understand recreation uses and resources in the planning area. Data assembled to support all planning phases must be sufficient to address the nature and complexity of existing and potential issues or concerns. These data may include information on the use and/or demand for public land recreation opportunities and existing/desired recreation setting characteristics." Recreation Manual at .06C1.

74.     With the purpose and need, and decisions to be made in mind, BLM justifies its decision with just two specific pieces of data: that the number of homes in Helena Valley has grown from 300 homes in 1984 to 1,000 homes in 2021 and that BLM estimates, based on data not available to the public, that 30,000 people visit annually. EA at 34. BLM also generally provides that "[t]he existing trail system is popular with hikers, disc golfers and traditional mountain bike users and, to a lesser degree, equestrians." *Id.*

75.     Based on the information disclosed in the Scratchgravel Plan, BLM's data does not include data on usage types and trends, specifically including impacts to equestrian users from the increase of bikers and the reduction of spaces to ride horses in the Helena area.

76.     Further, BLM notes that "exact visitor use data is unknown" and estimates usage by relying on data contained within its "Recreation Management Information System," EA at 34; "an internal system accessible only by BLM personnel." Request for Recreation Management Information System Data Input, Information Bulletin No. 2019-059, BLM (Aug. 30, 2019).

77.     Data collected by this system includes "the number of recreation visits, recreation visitor days, type of activities, permits issued, recreation site details, off-highway vehicle designation acres, and partnership agreement details." *Id.* Relying on this data, BLM estimates that 30,000 people visit Scratchgravel annually. EA at 34.

*Safety*

78.     Safety on the trails, specifically as it pertains to aggressive bikers and horses, was raised as a concern in at least 7 substantive scoping comments, yet BLM did not identify this safety concern in determining the issues for analysis.

79.     Safety is at the forefront of BLM's decisions and must be considered as the basis for any land use planning. Management actions must keep the goal of safety in mind to "[a]ddress visitor health and safety, resource protection, and use and user conflicts" through direct impacts (such as prohibiting a use within a particular area) or indirect impacts (such as posting signs about safety). Recreation Handbook at II-13 & -15.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

80.     Safety is also a priority in the Recreation Manual, whose first rule is to "[p]rovide for visitor safety, resource protection, and to address resource use conflicts." Recreation Manual at .02.

*Trail Design*

81.     BLM collaborated with the International Mountain Bicycling Association to create a book titled Guidelines for a Quality Trail Experience ("Trail Guidelines"), which it intends to use to "design and construct" the trails in Scratchgravel. The Trail Guidelines are specific only to mountain bikes, as it states throughout. For instance, the first sentence in the Vision & Goals chapter states that the book is "**a comprehensive approach to trail planning, design, construction, and management specific to mountain bike trails.**" Trail Guidelines at 14 (emphasis in original).

82.     Interestingly, the GDP Proposal notes that the "existing [trail] system was never designed for the needs of non-motorized, recreation users and therefore falls far short of meeting the management objectives of the [Recreation Plan]." At 6.

83.     BLM alleges is has "properly address[ed] use on the proposed, new trail system" by completing "a route evaluation . . . for specific trail zones." A review of BLM's "evaluation" reveals that the agency's priority is to accommodate mountain bikes.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

84.     For each trail, BLM conducted an Interdisciplinary Route Analysis Evaluation. For routes 1 (2.0 miles), 2a (4.1 miles), 3 (3 miles), 4 (5.6 miles), 5 (8.6 miles), BLM begins its analysis by stating the either that the trail would be optimized to or that enhanced, natural features would be incorporated to "appeal to pedestrians, equestrians, and mountain bikers." EA at 103, 106, 109, 112, 115, 118. Further, for routes 6b (1.5 miles), 7a (2.3 miles), 7b (2.3 miles), and 10 (7.5 miles) BLM states these trails "would be open to hikers and equestrians" but would incorporate challenges that would "appeal to mountain bikers." EA at 124, 127, 130.

85.     BLM solely then relies on the Trail Guidelines to guide its efforts to design the equestrian trails. EA at 105, 108, 111, 114, 117, 120, 123, 126, 129, 132, 135, 138, 141. Trail Guidelines are a wholly inappropriate guide for designing trails for non-mountain bike users.

86.     This method departs from past procedure, where BLM has relied on other, appropriate sources to design trails to accommodate a multitude of users. The Recreation Handbook refers users to "BLM Guidelines for a Quality Built Environment" ("Built Guidelines") to "help ensure all BLM facilities meet the same high standard and the needs of visitors." Built Guidelines at IV-7, BLM (Dec. 2010) (prepared by Belt Collins).

*Alliance for the Wild Rockies et al. v. Haaland et al.*

87.    The Built Guidelines outline "best management practices" to present "a process for planning and design on BLM lands." Built Guidelines 8. As it specifically pertains to equestrian use, the Built Guidelines note that "[e]questrian parking is separated from other uses," and the trail is composed of a soft surface, at 125; and that "[e]questrian trail, recreational trail, and drainage are separated," 131.[1]

*Comparison to GDP Consulting Proposal*

88.    The user experience goals and route descriptions are essentially the same as those found BLM's Plan. *Compare* GDP Proposal at p. 17 (user experience goals) *with* Plan at 14 (trail system user experience goals) and *compare* GDP Proposal at pp. 20-24 (route experience goals and description) *with* Plan at pp. 14-17 (proposed trail description and user experience goals).

89.    Overarchingly, BLM encouraged an outside group to submit a proposal, which it appears to have adopted wholesale (the proposed trail system, the underlying data about desired user experience, and the trail descriptions are essentially the same between the Plan and the GDP Proposal).

90.    GDP's proposed map (Figure 2) is also strikingly similar to the map in the Plan (Figure 1).

---

[1] The Built Guidelines cite to a Forest Service document titled *Equestrian Design Guidebook For Trails, Trailhead, and Campgrounds*, 0723-2816-MTDC, Missoula MT (2007) ("Equestrian Design Guidebook"). BLM cited neither the Built Guidelines nor the Equestrian Design Guidebook when addressing its decisions concerning equestrian usage of Scratchgravel.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

**Figure 2. GDP Proposal Trail Map**



<u>FIRST CLAIM FOR RELIEF</u>
**(FLPMA and APA)**
*Failure to Design for Multiple Use by Ignoring Impacts to and
Adequately Plan Trails for Equestrian Trail Users*

91.    Plaintiffs reallege and incorporate by reference all previous

paragraphs.

92.    BLM must manage public lands "on the basis of multiple use." 43

U.S.C. § 1701(a)(7). The Agency also has a mandate to reduce conflicts among

recreational users on public lands, 43 C.F.R. § 8342.1; and states that part of the

purpose behind the Plan is to reduce user conflicts. *E.g.* EA at 34. The Butte Plan

notes "Route safety data" is "incomplete or substantially lacking" at Scratchgravel. Butte Plan at 325.

93. The Scratchgravel Plan completely ignores the impacts to equestrian users from aggressive and districted mountain bike users and the recent closure of several regional trails to equestrians and does no planning for their experiences.

94. BLM acknowledges there are existing "conflicts between mechanized and non-mechanized users," but blames that problem entirely on a lack of definition for "site-specific recreation opportunities, experiences, and benefits" and "a lack of structured and desired opportunities." EA at 34. The agency also admits that existing trails "were not designed to reduce conflicts" between users. EA at 34. As part of its analysis regarding user conflicts and safety, BLM essentially places the onus on equestrians to avoid conflicts with other users by either staying on the trails "only [] available to equestrians and hikers" or by using their "greater ability to reduce conflict by utilizing the additional/alternative routes and areas based on the amount of use on a particular day." EA at 40, 41.

95. BLM cannot arbitrarily delegate its duty to reduce user conflicts, thereby favoring the mountain bikers' experiences over the equestrian users' experiences.

96. Additionally, BLM's Scratchgravel Plan has exponentially increased the number of trail intersections, including on trails that will be set aside for

*Alliance for the Wild Rockies et al. v. Haaland et al.*

equestrians and hikers in the future, but has failed to address how it will keep everyone safe and ensure compliance with yield laws (BLM admits the additional trails will increase the route density to over 9 mi/mi$^2$. EA at 51). Even if equestrian users take on the burden of ensuring their safety by riding only on these trails, they are still in danger from these intersections and increased density, which BLM has ignored.

97.     BLM's entire analysis, or lack thereof, of the equestrian experience relies entirely on the data and conclusions from the GDP Proposal and states it will use the Trail Guidelines document to design trails for equestrians. The Trail Guidelines *explicitly states* it is not designed to address non-mountain bike users. Use of this document to design trails that are intended to be used by non-mountain bikers is arbitrary, capricious, and in violation of law. Furthermore, the GDP Proposal explicitly states the existing trails were "never designed for the needs of non-motorized, recreation users." BLM has not properly considered non-mountain bike users when it relies on trials that were not designed with those users in mind.

98.     Further, BLM's decision to ignore the appropriate planning documents it has relied upon in the past and use a planning document not designed for this purpose, that constitutes a change in position that must be justified. BLM has previously used trail planning documents designed with a broader scope of trail

user in mind, including equestrians, but has abruptly changed course and decided to use a document that clearly does not apply to this particular use.

99.     If these newly built trails are truly intended to be multi-use, BLM must rely on planning documents that address multi-use. It is arbitrary and capricious to change its position on appropriate guidance documents without any justification for the change.

100.    Plaintiffs respectfully request the Court disallow BLM to rely on the GDP Consulting report to finalize the Scratchgravel Plan.

SECOND CLAIM FOR RELIEF
**(NEPA and APA)**
*Failure to Rely on Transparent, Quality Data*
*In Making Important Scratchgravel Plan Decisions*

101.    NEPA requires BLM to ensure its actions are based upon sound, reliable, and transparent data. NEPA is intended to "guarantee that the relevant information will be made available to the larger public audience." *Shasta Resources Council v. United States Dept. of Interior*, 629 F. Supp. 2d 1045, 1048 (E.D. Cal. 2009) (internal alterations omitted).

102.    The stated purpose and need for the Plan is "to reduce future conflicts and resource impacts by providing a trail system that can accommodate and support the current and anticipated future level of recreational use in this area," requiring BLM to make decisions on "[w]hat type and level of visitor services,

amenities, facilities, and developments will be provided and in what locations?"
EA at 5.

103.   By keeping the underlying supporting data regarding usage trends
and, by implication, any assumptions, methodologies, and foreseeable impacts,
secret from the public, BLM is in violation of NEPA and its own regulations. And
by failing to justify its conclusions about current and future usage, including by
usage type, BLM is acting in an arbitrary manner, in violation of the APA.

104.   The Responsible Official here has not properly assessed, "with
appropriate supporting documentation," the gaps in data or the impacts to its
analysis from a lack of data or whether new circumstances justify a different
analysis.

105.   Alliance and NEC respectfully request this court order BLM
immediately release data relied upon and contained in the Recreation Management
Information System regarding the trends regarding types and numbers of users at
Scratchgravel, as well as any other sources of user data considered and/or relied
upon.

THIRD CLAIM FOR RELIEF
**(NEPA and APA)**
*Failure to Adequately Disclose & Analyze Environmental Impacts*

106.   Plaintiffs reallege and incorporate by reference all previous
paragraphs.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

107.    BLM did not adequately address impacts to wildlife, soils, and illegal trail and jump building. When evaluating impacts, BLM is directed to consider the impacts of the effects of the Plan for the short-term (effects lasting less than 5 years), the mid-term (effects lasting 5-10 years), and long-term (effects lasting more than 10 years). *Id.* at 324. BLM cannot evaluate these impacts because it has no timeline for completion of the project as the "trail system would be completed in phases, as partnerships and/or funding becomes available." EA at 4. Because it has no plan for obtaining the funding, BLM is failing to consider the impacts to other users while it piecemeal completes the newer trail system and how it will exclude mountain bikers from and address illegal trail building within the existing trails.

108.    BLM received specific information from the local relevant agency that Scratchgravel "are within functional and utilized elk winter range" and "are the largest block of intact and undeveloped land in the Helena Valley." However, BLM's analysis only focuses on the extent to which the Scratchgravel area has degraded by past development, concluding "the Helena area no longer provides the high-quality habitat that it once did." EA at 47. BLM cannot ignore the information regarding elk use of the Scratchgravel area.

109.    "Construction of the trail system would be completed in phases, as partnerships and/or funding becomes available." EA at 4. Because BLM has given

no indication of when it will start, let alone complete, construction of the new trails, mountain bikers have begun creating new trails and mountain bike features on existing trails. Additionally, because the project will be completed in stages, BLM has failed to reveal how it will manage usage on specific trails once some of the new trails are complete.

110.   BLM is aware of these activities by mountain bikers, but has failed to consider how it will prevent these actions. It was reasonably foreseeable that by announcing a new bike arena at some indeterminate point in the future, that bikers would start to adapt the trails currently available for use to their own preferences. Once a mountain bike feature is created, it will attract others to the area. BLM must address how it will prevent these actions in the future and how it will keep mountain bikers off the old trails, once the new ones are complete. Further, BLM must address the impacts to soils and wildlife for these illegal trails.

111.   NEPA regulations require federal agencies to discuss the direct, indirect, and cumulative effects of their actions in an EA. 40 C.F.R. §§ 1502.16, 1508.8. The EA should provide a clear basis for choice among alternatives. 40 C.F.R. § 1502.14.

## FOURTH CLAIM FOR RELIEF
### (Federal Advisory Committee Act)
*Failure to Properly Establish a FACA Chartered Group*

112.    Plaintiffs reallege and incorporate by reference all previous paragraphs.

113.    GDP Consultants is an advisory committee as defined by FACA.

114.    BLM has sought information and advisory reports from at least one mountain biking-affiliated group without following the procedures required under FACA.

115.    BLM violated FACA, U.S.C. App. 2 § 9(a)(2) because it failed to establish the advisory committee following a determination on formal record, with timely notice published in the Federal Register, that this advisory committee was in the public interest in connection with the performance of duties imposed on the BLM by law.

116.    BLM violated FACA, U.S.C. App. 2 § 9(c) because it failed to file an advisory committee charter with the Secretary of the Interior, with the Director of the BLM, or with the standing committees of the Senate and House of Representatives having legislative jurisdiction before convening the advisory committee, before publishing its report, and before relying upon its advisory capacity in issuing its final decision.

*Alliance for the Wild Rockies et al. v. Haaland et al.*

117.   BLM violated FACA, U.S.C. App. 2 § 5(b)(2), (c), because it failed to ensure that membership of the advisory committee was fairly balanced by ignoring and excluding participation of user groups BLM had previously identified as likely to having conflicting interests to those advising BLM through the advisory committee.

118.   BLM created a chart of desired trail user experience goals, but did not disclose where it got this data from. BLM held no public meetings and if it obtained the data from the scoping comments, it would have indicated that although the experience and trail itself are important, a much more important consideration is safety and that mountain bikes often fail to yield to equestrian users.

119.   BLM violated FACA, 5 U.S.C. App. 2, § 10 because, among other things, BLM failed to open advisory committee meetings to the public; publish timely notice of meetings in the Federal Register; permit interested persons to attend or file statements with the advisory committee; make available for public inspection records, reports, transcripts, meeting minutes, appendices, working papers, drafts, studies, agendas, sponsors, or other documents made available to or prepared for or by the advisory committee; keep detailed minutes of advisory committee meetings or certify the accuracy of the minutes as required by FACA;

designate an officer or employee of the agency to chair or attend each meeting of the advisory committee.

120.    BLM's proposed Plan and final Plan were nearly identical to proposals provided to the Agency by the GDP Consultants Advisory Committee.

121.    Further, BLM sought advice and feedback from the International Mountain Bicycling Association on its final decision prior to its release.

122.    BLM must immediately disclose its use of unauthorized groups and, to the extent it used their proposal and information to justify its decision, it must independently verify information provided and reach its decision without interference from outside groups.

<u>FIFTH CLAIM FOR RELIEF</u>
**(FLPMA AND APA)**
*Failure to ensure the Scratchgravel Plan complies with the Butte Plan*

123.    BLM appears to claim that the Scratchgravel Plan complies with the applicable Resource Plan, here the Butte Plan. EA at 12. To accomplish this, the Butte Plan lays out a procedure for evaluating whether the trail will have a low, medium, or high impact on wildlife, soils, and other resource evaluation criteria. The Agency has not done the type of route analysis required under the Butte Plan, including assessing wildlife (including habitat fragmentation and connectivity) and soils. Route setting must follow a specific procedure for analysis. Butte Plan at App'x D pp. 149-53.BLM does not address how it decided where the new trails

would go or the appropriate density for those trails and why it could forego the analysis laid out in the Butte Plan.

124.    Rather than conduct a proper route analysis, BLM makes broad conclusions about impacts to wildlife, EA at 9-10; broadly concludes that "BLM's Interdisciplinary Team was generally able to determine that the proposed trail system" complies with the Designation Criteria, EA at 27, 45-49; and adopts a wait and see approach to soils management, EA at 31.

125.    BLM is in possession of information regarding elk use, trail design, the possibility of grizzly bear in proximity, and the fragility of the soils within the Scratchgravel area. However, BLM has dismissed each of these issues without the proper analysis and confirmation that the Scratchgravel Plan complies with the Butte Plan. EA at 9-10, 31, 46.

126.    Plaintiffs respectfully requests this Court require BLM to complete its trail analysis obligations contemplated by the Butte Plan, including addressing impacts to elk and soils, and confirm BLM engaged in the proper Endangered Species Act consultation for grizzly bear, before it commits resources to the Scratchgravel Plan.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

A.     Declare that any implementation of the Defendants' Decision Notice violates NEPA, APA, and FACA and their respective implementing regulations; and

B.     Order, adjudge, and declare that the Scratchgravel Plan EA, FONSI, and Decision are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under NEPA and the APA, and reverse and set aside the EA, FONSI, and Decision; and

C.     Order the Defendants to comply with the requirements of NEPA and APA and their respective implementing regulations by fully disclosing its underlying data and adequately analyzes the interrelated environmental, cultural, economic, and socioeconomic impacts, effects, and consequences associated with this change, including usage of appropriate guidance documents to meet the needs of the users; and

F.     Enter appropriate preliminary and permanent injunctive relief prohibiting the BLM from allowing any implementation of the Proposed Action in order to further ensure that its decision complies with federal law and avoids irreparable harm to the environment until such time as BLM is in full compliance

with the law; and

      G.    Award Plaintiffs their reasonable attorneys' fees, costs, expenses and disbursements associated with this action under the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., and any and all other provisions of law; and

      H.    Award such other relief as this Court deems just and proper.

      Respectfully submitted this 16th day of September, 2022.

/s/ Sam Martin
Sam Martin
DELLI BOVI AND MARTIN, LLC
30 W. 14th St. Ste. 204
Helena, MT 59601
(406) 438-6143
sam@sammartinlaw.com
*Attorney for Plaintiffs*

/s/ Brian Ertz
Brian Ertz
ERTZ LAW, PLLC
Post Office Box 665
Boise, ID 83701
(208) 918-1663
(208) 545-9770
brian@ertzlaw.org
*Pro hac vice application forthcoming*

/s/ Jessica Christy
Jessica Christy
CHRISTY LAW LLC
2055 S. Oneida St., Ste. 394
Denver, CO 80224
(720) 729-7841
jessica@christylaw.legal
*Pro hac vice application pending*

Addresses of Plaintiffs

Alliance for the Wild Rockies
Post Office Box 505
Helena, Montana 59624

Native Ecosystems Council
Post Office Box 125
Willow Creek, Montana 59760