**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BUTTE DIVISION**

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, and NATIVE ECOSYSTEMS COUNCIL, | **CV-22-62-BU-BMM** |
| Plaintiffs, | |
| vs. | **ORDER** |
| DEB HAALAND, in her official capacity as Secretary of the Department of the Interior; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; SONYA GERMANN, in her official capacity as Montana-Dakotas State Director at the Bureau of Land Management; LINDSEY BABCOCK, in her official capacity as Field Manager of the Butte Field Office, Bureau of Land Management; and Unnamed Authorized Officer, who signed the Finding of No Significant Impact and Decision Record, | |
| Defendants. | |

**INTRODUCTION**

Plaintiffs Alliance for the Wild Rockies ("Alliance") and Native Ecosystems

Council ("NEC"), each an environmental conservation advocacy organization

(collectively "Plaintiffs"), filed this action against the United States Bureau of Land

Management ("BLM") and other named Federal officers (collectively "Defendants"). (Doc. 1.) Plaintiffs allege that BLM violated the National Environmental Procedure Act ("NEPA"), Federal Land Policy Management Act ("FLMPA"), Administrative Procedure Act ("APA), and the Federal Advisory Committee Act ("FACA") when BLM developed the Scratchgravel Hills Recreation Area Management Plan ("Scratchgravel RAMP"). (*Id*.)

Plaintiffs move for summary judgment on all claims. (Doc. 28-1.) Plaintiffs ask the Court to declare that BLM failed to comply with NEPA, FLPMA, APA, and FACA and to enjoin BLM from administering the Scratchgravel RAMP until BLM complies with these federal statutes. (*Id*. at 50–51; Doc. 1 at 45.) Defendants filed a cross motion for summary judgment and asserted that Plaintiffs lack standing, waived certain NEPA and FLPMA claims by failing to plead them in Plaintiffs' complaint, and that BLM complied with NEPA, FLPMA, APA, and FACA when it developed the Scratchgravel RAMP. (Doc. 32.)

## BACKGROUND

The Scratchgravel Hills lie outside Helena, Montana. (Doc. 35 at 2.) Forty miles of multi-use trails currently exist within the Scratchgravel Hills. (Doc. 37 at 1.) These trails permit hiking, mountain biking, and horseback riding. (*Id.*) Mountain bikers and horseback riders number among these recreationalists. (Doc. 35 at 21.)

BLM estimates the Scratchgravel Hills annually attract about 30,000 visitors. (*Id*. at 20.)

The Butte Resource Management Plan ("Butte RMP") represents the land use plan underlying the Scratchgravel Hills. (BLM-000269–352.) The Butte RMP designates 5,500 acres of the Scratchgravel Hills as a Special Recreation Management Area ("SRMA" or "Scratchgravel Hills"), where recreation such as "[h]iking, mountain biking, horseback riding, and hunting" constitute the land's primary purpose. (BLM-000019, 000316, 000320.) The Scratchgravel Hills is also subject to the Helena Travel Management Plan ("Helena TMP"). (BLM-000427.)

BLM announced a proposed action to establish a Recreation Area Management Plan for the Scratchgravel Hills area on January 31, 2018. (Doc. 35 at 4.) The Project Initiation Letter noted that, in 2017, GDP Consulting had submitted "a detailed proposal" to BLM suggesting that BLM construct new non-motorized trails. (*Id.*) Eric Grove ("Grove") of GDP Consulting had developed the recreational plan proposal over a period of years ("Grove Proposal"). (*Id*. at 3–5.) Grove took the following actions before submitting the Grove Proposal: began to meet with recreationalists and homeowners in the spring of 2015; first approached BLM about building a purpose-built, non-motorized trail system in 2016; and informally surveyed over 130 landowners about the potential changes to recreation in the Scratchgravel Hills. (*Id.* at 3–5, 35). Grove continued his involvement during BLM's

planning process. (*Id*. at 16, 29.) Grove communicated updates to BLM project lead Brad Colin ("Colin") who provided updates on the Scratchgravel RAMP to Grove. (*Id*.)

BLM announced its plan to create the Scratchgravel RAMP on March 20, 2018. (Doc. 37 at 3.) BLM began to receive public comments. (*Id*.) BLM released its Preliminary Environmental Assessment (the "Preliminary EA") on June 24, 2020. (*Id*. at 4; BLM-000182.) The public comment period ended September 22, 2020, and BLM extended the public comment period until October 6, 2020. (*Id*. at 4; BLM-000182.) BLM reviewed all the public comments it received before preparing the Final Environmental Assessment ("the Final EA"). (Doc. 37 at 4, 6.) BLM released the Final EA on March 9, 2022. (*Id*. at 6–7.)

BLM proposed an "Alternative C" in the Final EA in response to the public comments that it received in response to the Preliminary EA. (BLM-000021.) The Final EA discussed recreational use, soil impacts, trail location, and the impacts to wildlife in the Scratchgravel Hills. The Final EA notes the growth of housing near the Scratchgravel Hills and estimates the annual number of visitors. (BLM-000048.) The Final EA concedes the "exact visitor data is unknown." (*Id*.) The Final EA notes that BLM chose Alternative C to allow "less overlap and greater separation" from the existing trails. (BLM-000035.) The Final EA states that BLM found that a majority of trails currently existing and proposed by Scratchgravel RAMP would

exist upon soil "rated as poor" or "very limited" for their intended use, but the Final EA concluded that "[t]he overall condition of the soils within the Scratchgravel Hills [Scratchgravel RAMP] project area is good." (BLM-000083–89.)

BLM issued a scoping letter for a future fuel reduction treatment in the Scratchgravel Hills in December 2022. (Doc. 37 at 11.) The Final EA noted the future fuel treatment project generally in its cumulative impact analysis. (*See* BLM-000096.) The Final EA did not specifically consider the future treatment announced in December 2022. (*See id*.)

BLM ultimately selected Alternative C as the Scratchgravel RAMP. (Doc. 37 at 7.) The Scratchgravel RAMP will implement 35 miles of new trails within the Scratchgravel Hills. (*Id*. at 9.) The Scratchgravel RAMP will implement two trail systems: one for hikers and horseback riders only and the other for mountain bikers only. (*Id*.) The Scratchgravel RAMP lacks a timeline to implement the 35 miles of the new trail. (Doc. 35 at 16.) Several BLM planning documents appear to adopt language, sometimes verbatim, and other work-product from the Grove Proposal. *See, e.g.,* (Doc. 35 at 6, 37.) Alternative C included several proposed mountain bike trails following the same or similar routes as trails proposed by the Grove Proposal. *See, e.g.,* (*Id*. at 9–10.) Other trails included in Alternative C bear no Grove Proposal analog. *See, e.g.,* (*Id*. at 11.)

**LEGAL STANDARD**

A court must set aside a challenged agency action that proves "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" when analyzing NEPA or FLPMA claims. *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). A court generally must apply this standard of review to "the administrative record in existence at the time of the [challenged agency] decision[.]" *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996). Remand to the agency for additional analysis proves proper "if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it[.]" *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

**DISCUSSION**

Plaintiffs allege that BLM violated NEPA and the APA in the following ways: (1) BLM unlawfully used the Grove Proposal; (2) BLM failed to consider adequate data regarding desired outcomes, safety, recreational usage, and soil impacts; (3) BLM failed to evaluate and disclose environmental impacts on elk; and (4) BLM failed to consider the fuel reduction project in the Final EA's analysis of cumulative effects. (Doc. 28-1.) Plaintiffs allege that BLM violated FLPMA and the APA by failing to comply with the Butte RMP and failing to adhere to the principles of

multiple use. (*Id*.) Plaintiffs further allege that the Grove Proposal constituted an advisory committee under FACA and that BLM failed to properly establish a FACA advisory committee. (*Id*.) BLM disputes these claims and asserts that Plaintiffs lack standing and that Plaintiffs' complaint failed to meet the notice pleading standards for certain NEPA and FLPMA claims. (Doc. 33 at 22–28.)

## I.   Standing.

BLM argues that Plaintiffs lack standing because Plaintiffs have not alleged that BLM's conduct causes injuries to their individual members. (Doc. 33 at 22–25.) Each Plaintiff may assert standing on behalf of their members for their NEPA, FLPMA, and FACA claims provided each demonstrates that: "1) its members would otherwise have standing to sue in their own right; 2) the interests [the organization] seeks to protect are germane to the organization's purpose; and 3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See Hunt v. Washing State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Alliance satisfies the second prong because Alliance exists to protect and preserve the environment within the northern Rocky Mountains, which is where the Scratchgravel Hills lie. The Court finds that Alliance satisfies the third prong because the relief Alliance requests does not require Alliance's members to individually participate in this lawsuit.

An individual possesses a right to sue when: "(1) [the individual] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) [the injury] is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). Alliance satisfies the third prong for organizational standing because its members possess a right to sue. The Court need not consider whether NEC possesses standing because Alliance satisfies standing for all claims that Plaintiffs have asserted. *See Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993).

## A.    Injury in fact

An individual suffers an injury in fact when there is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 559–60. "[A]n individual can establish injury in fact by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that [the plaintiff] really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000)

Eric Easton ("Easton") and Beverly Rankin ("Rankin") are both members of Alliance. (Doc. 28-2 at 1, ¶ 1, 25; Doc. 28-3 at 1, ¶ 5.) Each has a connection to the Scratchgravel Hills because they live near the Scratchgravel Hills, currently ride

horses in the Scratchgravel Hills, chose to live near the Scratchgravel Hills because of its proximity to public land that allows horseback riding, and plan to continue riding horses within the Scratchgravel Hills. (Doc. 28-2 at 1–2, 4, ¶¶ 2–3, 8, 16, 25; Doc. 28-3 at 1, ¶¶ 3, 4–5.) Easton's declaration also states that he enjoys viewing the wildlife and flora within the Scratchgravel Hills while recreating. (Doc. 28-2 at 4–5, ¶ 25.)

Easton's and Rankin's declarations demonstrate they are concerned about recreating safely within the Scratchgravel Hills because of a previous physical injury caused by a mountain biker, complaints regarding safety within the community, and the unsafe encounters that they claim to have experienced. (Doc. 28-2 at 2–3, ¶¶12–15; Doc. 28-3 at 2, ¶¶ 4–5, 9.) Both members state that their recreational enjoyment and use of the Scratchgravel Hills has decreased due to their safety concerns and that their enjoyment on the Scratchgravel Hills will continue to decrease. (Doc. 28-2 at 2–3, ¶ 10–14, 16; Doc. 28-3 at 2, ¶ 8.) Both members contend that BLM failed to account for safety concerns when developing the Scratchgravel RAMP. (Doc. 28-2 at 4–5, ¶¶ 23, 27–29; Doc. 28-3 at 2, ¶¶ 1, 12.) Both members' declarations establish that they have suffered a concrete harm because they allege that their enjoyment and use of the Scratchgravel Hills has lessened due to their safety concerns and their use will continue to decrease because the Scratchgravel RAMP allegedly does not account user safety.

9

**B.    Traceability**

BLM argues that Plaintiffs fail to establish causation. (Doc. 33 at 22.) BLM argues that Easton's and Rankin's declarations do not establish that the Scratchgravel RAMP caused the previous physical injury, will cause conflicts between horseback riders and mountain bikers to continue, or how the Scratchgravel RAMP will diminish Easton's ability to view wildlife. (Doc. 33 at 22–24.)   A plaintiff establishes causation when "there [is] a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. "Once plaintiffs seeking to enforce a procedural requirement establish a concrete injury, 'the causation and redressability requirements are relaxed.'" *WildEarth Guardians v. U.S. Dep't of Agric.,* 795 F.3d 1148, 1154 (9th Cir. 2015) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011)).

In *WildEarth Guardians*, the plaintiff sought to enjoin the Animal Plant Inspection Service ("APHIS") from using allegedly outdated studies to implement its wildlife management program. *Id*. at 1153, 1155.  The plaintiff submitted a declaration of its member that described how Nevada Wildlife Services Program's ("NWSP") management of wildlife, which uses APHIS's program and studies, decreased "[the member's] recreational and aesthetic enjoyment of the impacted area." *Id*. at 1153. The Ninth Circuit determined that the plaintiff's allegation that APHIS failed to update the studies and NWSP's use of these studies proved

10

sufficiently linked to the individual's decreased recreational and aesthetic enjoyment caused by NWSP's wildlife management. *Id*. at 1155.

Like in *WildEarth Guardians*, Plaintiffs ask the Court to order BLM to adhere to the procedural requirements within NEPA and FLPMA. (Doc. 28-1 at 22–24, 50–51.) Alliance submitted declarations in which Easton and Rankin describe dangerous trail conditions that harm their aesthetic and recreational enjoyment of the Scratchgravel Hills. Plaintiffs allege that BLM developed the Scratchgravel RAMP upon inadequate data regarding trail safety and environmental impacts and that the Scratchgravel RAMP will continue to lessen Alliance's members' recreational and aesthetic enjoyment of the Scratchgravel Hills. (Doc. 28-1 at 16–17, 22–24.) Plaintiffs satisfied causation because BLM's alleged procedural error proves sufficiently linked to Easton's and Rankin's recreational and aesthetic injuries.

### C.   Redressability

BLM argues that Plaintiffs fail to establish redressability. (Doc. 33 at 22–23.) The redressability "requirement is satisfied when the relief requested – that the agency follow the correct procedure – may influence the agency's ultimate decision." *WildEarth Guardians*, 795 F.3d at 1156 (citing *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008)). Alliance satisfies the redressability requirement because BLM may reconfigure the Scratchgravel

RAMP after considering the data and issues that Alliance asks the Court to order to BLM consider.

## II.     National Environmental Policy Act

The National Environmental Policy Act requires federal agencies to take a "hard look" at the "environmental consequences" of their decision making. *Robertson v. Methow Valley*, 490 U.S. 332, 350 (1989) (internal citations omitted). The "hard look" standard requires a federal agency to provide "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *350 Montana v. Haaland*, 50 F.4th 1254, 1265 (9th Cir. 2022) (quoting *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1194 (9th Cir. 2008)). A court "must determine whether the EA foster[s] both informed decision-making and informed public participation." *Ctr. for Biological Diversity*, 538 F.3d at 1194 (internal quotations & citations omitted).

### A.     BLM's use of the Grove Proposal did not violate NEPA

BLM argues that Plaintiffs only alleged FLMPA violations for BLM's use of the Grove Proposal, not a NEPA violation, and that Plaintiffs cannot raise this claim on summary judgment. (Doc. 33 at 25–27.) The Court finds that Plaintiffs met the liberal pleading standard, and the Court will rule upon this claim. *See* Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 48 (1957), *abrogated in part on other grounds*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

An agency must "prepare NEPA documents, such as an EA or an EIS, 'before any irreversible and irretrievable commitment of resources.'" *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (quoting *Conner v. Burford*, 848 F.2d 1441, 1446 (9th Cir.1988)). In *Metcalf*, the National Oceanic and Atmospheric Administration ("NOAA") began working with the Makah Indian Tribe to obtain a gray whale hunting quota for the tribe two years before completing an EA for the project. *Id*. NOAA entered a contract with the Makah that committed NOAA to submit a proposal and manage the gray whale harvest before completing an EA. *Id*. The Ninth Circuit determined that "the point of commitment" occurred "when NOAA signed the contract with the Makah in March 1996 and then worked to effectuate the agreement." *Id*.

Unlike in *Metcalf*, BLM, from the Court's review of the record, did not reach a point of commitment to the Grove Proposal. The record does not indicate that BLM entered a contract with Grove or GDP that obligated BLM to effectuate the Grove Proposal. BLM announced its plan to develop the Scratchgravel RAMP one year after having received the Grove Proposal. (BLM-001139, 003290.) BLM did not make an irreversible and irretrievable commitment to the Grove Proposal because BLM remained free to determine whether to use the Grove Proposal as BLM saw fit. *See id*. at 1144.

**B.      Usage, desired outcomes, and safety**

BLM argues that Plaintiffs only alleged FLMPA violations for BLM's use of the Grove Proposal, not a NEPA violation, and that Plaintiffs cannot raise this claim on summary judgment. (Doc. 33 at 25–27.) Plaintiffs met the liberal pleading standard, and this Court will rule upon this claim. *See* Fed. R. Civ. P. 8(a)(2); *Conley*, 355 U.S. at 48, *abrogated in part on other grounds*, *Bell Atlantic Corp*, 550 U.S. at 563.

Plaintiffs argue that BLM improperly relied on the data that Grove collected when he surveyed recreationalists and homeowners about recreation in the Scratchgravel Hills. (Doc. 36 at 16.) This survey data constituted a single set of information that BLM used to develop the Scratchgravel RAMP. BLM used meetings with individual stakeholders, public comments, evidence of nearby residential growth, history of law enforcement encounters, and BLM staff visits to the Scratchgravel Hills area to gather further information about usage type, preference, and safety. (Doc. 37 at 2, 4–5.)

BLM received 650 comments in response to the Preliminary EA. (Doc. 37 at 4; *see also* BLM-000021.) These comments discussed a variety of topics that represented a diverse set of interested stakeholders. (Doc. 37 at 5.) BLM recognizes that it lacked "exact visitor use data" for the Scratchgravel Hills and that it did not possess studies regarding the historical recreational usage itemized by the type of

14

recreation. (BLM-000048.) BLM referred to the increase in housing development near the Scratchgravel Hills to estimate the total recreational use of the Scratchgravel Hills. (*Id*.) The record reflects that BLM took a hard look at the issues regarding safety, current usage, and desired outcomes based on its collection of a substantial amount of information regarding these issues. *See Audubon Soc'y of Portland v. Haaland* 40 F.4th 967, 987 (9th Cir. 2022). The lack of certain data that specifies historical recreational use does not render inadequate BLM's NEPA analysis. *See id*. (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 592 (9th Cir. 2014)).

### C.    Impacts to soils within the Scratchgravel Hills

BLM took a hard look at the environmental impacts to soil that may result from adding new trails within the Scratchgravel Hills. BLM assessed data regarding how susceptible the soils are to erosion and how suitable the soils are for the currently existing and proposed trails. (BLM-000083–89.) The data revealed that approximately 60% of the soils upon which the existing trail system lies received a "very limited" suitability rating for hiking and horseback riding. (BLM-000083.) Approximately 76%–80% of the same soils received a "poor" suitability rating for testing that simulated how mountain biking would impact the soil. (*Id*.) The Final EA indicates that some trails and roads have exhibited signs of erosion and identified

that this erosion occurs on "steeper slopes" or where "soils have relatively low strength." (BLM-00082.)

Approximately 70% of the proposed trails that the Scratchgravel RAMP implements would exist upon soils that rate "very limited" for hiking and horseback riding. (BLM-000085.) Approximately 87%–90% of the trails that the Scratchgravel RAMP implements would occur upon soils that rate "poor" for mountain biking. (BLM-000085.) "Poor" and "very limited" ratings indicate high maintenance would be expected. (BLM-000083, 000086.)

BLM also assessed the erosion that may occur from constructing the new trails. BLM reasoned that minor erosion may occur during construction but that continued erosion would not continue due to trail placement and construction techniques. (BLM-000089.) The Final EA indicates that inspections will occur before constructing a trail to address "site specific soil concerns." (BLM-000088.) BLM concluded that the erosion that may result from constructing new trails and recreationalists using the new trails will be localized and not substantially degrade the health of soils within the Scratchgravel Hills because only 35 miles of trail will be added within the Scratchgravel Hills. (BLM-000089.) BLM manages 5,500 acres of land within the Scratchgravel Hills through the Scratchgravel RAMP. (BLM-000072.)

BLM observed that the existing trail system lies upon soils that rated equally as the soils upon which the new trails would be constructed. (BLM-000083–89.) The record indicates that the existing trails did not exhibit substantial erosion. (BLM-00082.) The Court notes that only 35 miles of trail would be constructed on a 5,500-acre parcel. (BLM-000072, 000089.)   BLM did not arbitrarily and capriciously approve new trails in the Scratchgravel Hills where soils exhibited similar characteristics to the soils on which existing trails lie. *See Audubon Soc'y*, 40 F.4th at 986 (concluding that the challenged agency took a hard look at the environmental effects of pesticides on wildlife refuges where the "EA found that '[n]o mortalities have been documented from current-generation pesticides in waterfowl, fish-eating birds, or raptors on the refuges.'")

## D.   Environmental impacts

Plaintiffs argue that BLM failed to consider that habitat that elk use as winter range exist within the Scratchgravel Hills. (Doc. 28-1 at 47.) The studies discussed within the Final EA demonstrate that BLM took a hard look at the environmental impacts relating to elk. The Final EA discussed that the most important habitat areas within the Scratchgravel Hills are those areas used by elk and other common species for their winter range but that most of the Scratchgravel Hills landscape constitutes general range. (BLM-000060.) It also discusses studies regarding the quality of habitat within the Scratchgravel Hills. (BLM-000060–61.) BLM concluded that the

Scratchgravel Hills "no longer provides the high-quality habitat it once did." BLM-000061.

The Final EA discusses the short-term and long-term disturbances that may occur to elk and other animals. (BLM-000072.) The Final EA included studies that examined elk behavioral responses to disturbances created by construction, hiking, horseback riding, and mountain biking. (BLM-000072–73.) The Final EA also discussed how shifting to wildlife-friendly fencing areas in problem areas can benefit elk. (BLM-000074.)

Plaintiffs argue that BLM failed to consider Montana Department of Fish, Wildlife and Parks's ("Montana FWP") concerns about elk. (Doc. 28-1 at 44–47.) The Final EA states that BLM used the information from Montana FWP's digital map to ascertain where elk winter range exists in the Scratchgravel Hills. (BLM-000060.) Montana FWP's digital map indicated that Montana FWP did not determine any elk winter range to exist within the Scratchgravel Hills. (*Id.*) Montana FWP submitted an untimely public comment stating that Montana FWP's digital map did not reflect the current elk habitat existing in the Scratchgravel Hills. (BLM-005044–46.) Montana FWP's comment also suggested that BLM should lower route density and focus on habitat connectivity. (*Id.*) A BLM biologist and Montana FWP biologist exchanged emails following Montana FWP's comment and discussed how BLM could adjust the Preliminary EA to benefit elk. (BLM-003049–51.)

18

BLM's correspondence with Montana FWP demonstrates that BLM considered Montana FWP's concerns regarding impacts to elk habitat even though the Final EA mistakenly states that elk winter range does not exist within the Scratchgravel Hills. *See Swanson v. United States Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996) (a court will not "hold [an EIS] insufficient on the basis of inconsequential, technical deficiencies" but will employ a "rule of reason" to determine whether an EIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences") (citation omitted); (BLM-0000173, 003043–51.) The record indicates BLM met its duty under NEPA when it engaged in discussions regarding the Scratchgravel RAMP effects on elk. The BLM assessed the current elk habitat existing within the Scratchgravel Hills. BLM also consulted numerous studies regarding effects on elk behavior in correspondence with Montana FWP. *See Native Ecosystems Council*, 697 F.3d 1043, 1054–55 (9th Cir. 2012) (deferring to the challenged agency's conclusion where the agency "reasonably determined" reports that the agency considered were "based upon corrected and more recent data and various studies").

### E.    Cumulative impacts

BLM argues that Plaintiffs did not plead their claim that BLM failed to consider the cumulative impacts of a fuel reduction project that may occur in the Scratchgravel Hills in Claim 3. (Doc. 39 at 11–12.) The Court finds that Plaintiffs

met the liberal pleading standard, and this Court will analyze this claim. *See* Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 48 (1957), *abrogated in part on other grounds*, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007).

NEPA requires an agency to analyze the potential environmental impacts resulting from reasonably foreseeable projects. *See* 40 C.F.R. § 1508.27(b)(7). A future project is not reasonably foreseeable when an EA pre-exists the release of a future project's scoping period *N. Cascades Conserv. Council v. U.S. Forest Serv.*, No. 2:22-CV-00293-SAB, 2024 WL 188374, at *5 (E.D. Wash. Jan. 17, 2024), *appeal docketed*, 24-1422 (Mar. 11, 2024).

The fuel reduction project that will thin trees within the Scratchgravel Hills fails to constitute a reasonably foreseeable project. *See id.*, at *5.  In *N. Cascades*, a forest fire affected a portion of a project area between the Forest Service's initial EA and final EA. *Id*. at 2. The Forest Service assessed the fire's effects within this time to determine if a second project proved appropriate but a second project "had not passed the NEPA scoping stage" before the Forest Service's final EA. *Id*. at 5. The district court determined the final EA proved sufficient even though it failed to consider the cumulative impacts of the second project. *Id*. The situation here proves akin, and the Court finds the reasoning in *N. Cascades* persuasive. BLM released its initial scoping for the fuel reduction project in the Scratchgravel Hill nine months after BLM issued its Final EA for the Scratchgravel RAMP. (Doc. 37 at 11.) The

Final EA proves sufficient since the fuel reduction project fails to constitute a reasonably foreseeable project. *N. Cascades*, at \*5.

## III.   Federal Land Policy Management Act

FLPMA requires the Secretary of the Interior to "manage the public lands" by accounting for (1) "principles of multiple use and sustained yield" and (2) "in accordance with the land use plans [. . .] when they are available." 43 U.S.C. § 1732; *see* 43 U.S.C. § 1701(a)(7). A court first analyzes whether BLM complied with the underlying management directives when determining if BLM complied with FLPMA. *Oregon Nat. Res. Council Fund v. Brong*, 492 F.3d 1120, 1125 (9th Cir. 2007).

### A.   BLM complied with the Butte RMP's management directives

An RMP "embodies the substantive management directives which BLM must comply with under FLPMA, [a court's review] must start with, and remain anchored in, an understanding of the [RMP]." *Oregon Nat. Res. Council*, 492 F.3d at 1125. "BLM has 'a great deal of discretion in deciding how to achieve' compliance" with an underlying land use management plan, such as the Butte RMP. *See Klamath Siskiyou Wildlands Ctr. v. Gerritsma*, 962 F. Supp. 2d 1230, 1235 (D. Or. 2013) (quoting *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004)). The Butte RMP requires BLM to manage the Scratchgravel Hills to meet the recreational needs for uses such as "[h]iking, mountain biking, horseback riding, and hunting[.]"

(BLM-000019, 000316, 000320.) The Butte RMP also requires BLM to balance the goal of recreation with maintaining a healthy and diverse environment. (BLM-000281.)

### 1. The Butte RMP does not require BLM to use the Helena TMP criteria

Plaintiffs argue that the Butte RMP requires BLM to locate the trails proposed by the Scratchgravel RAMP as outlined in the Helena TMP, which is in Appendix D of the Butte RMP. (Doc. 28-1 at 34; Doc. 1, ¶¶ 123–26.) BLM disagrees. (Doc. 33 at 41–42.) The Helena TMP constitutes a summary of the procedures BLM used to develop the Helena TMP. *See* BLM-000394 ("The following written criteria *were used* . . ."). The language in Appendix D of the Butte RMP indicates it does not require BLM to apply the previous criteria it used to create the Helena TMP when BLM creates a future management plan, like the Scratchgravel RAMP. BLM also provided for offroad use when it developed the Helena TMP and BLM used the "designation criteria" outlined in 43 C.F.R. § 8342.1. (BLM-000393–94.) The regulation provides criteria for BLM to use when it designates public land "as either open, limited, or closed to off-road vehicles." 43 C.F.R. § 8342.1. BLM determined that re-establishing offroad vehicle use in the designated area proved to be outside the purpose and need of the Scratchgravel RAMP and removed the possibility from further analysis. (BLM-000046.) Nothing in the Helena TMP requires BLM to use the criteria contained therein when considering the provision of recreational

opportunities for non-motorized uses in the Scratchgravel Hills. BLM reasonably interpreted the Butte RMP. *See Klamath Siskiyou Wildlands*, 962 F. Supp. 2d at 1235 ("BLM reasonably interpreted the RMP to allow a relatively minor loss of soil productivity so long as the Project also includes practices to limit and mitigate such losses").

### 2. BLM complied with the Butte RMP's directive to collect data and optimize recreation and within the Scratchgravel Hills

BLM argues that Plaintiffs cannot assert that BLM violated FLPMA for allegedly relying on incomplete data regarding usage and safety on summary judgment because Plaintiffs plead this as a NEPA violation in their complaint. (Doc. 33 at 25–27.) The Court finds that Plaintiffs met the liberal pleading standard, and this Court will analyze and rule upon this claim. *See* Fed. R. Civ. P. 8(a)(2); *Conley*, 355 U.S. at 48, *abrogated in part on other grounds*, *Bell Atlantic Corp*, 550 U.S. at 563.

Plaintiffs argue that BLM failed to comply with the Butte RMP because BLM failed to collect the requisite data to assess the desired uses and trail safety, and that BLM failed to use the data that it did collect in accordance with the Butte RMP. Transcript of Hearing on Motions, 16:21–17:6 (May 8, 2024); (Doc. 28-1 at 38); (Doc. 36 at 16–18). BLM collected data regarding safety, desired outcomes, and usage from the 650 public comments that BLM received in response to the

Preliminary EA, meeting with individual stakeholders, and assessing total usage based on housing development in the Helena area through the NEPA process. (Doc. 37 at 4; *see also* BLM-000021, 000048.) The public comments BLM received discussed concerns regarding safety and desired outcomes. (Doc. 37 at 5.)

BLM reviewed all 650 public comments that BLM received in response to its Preliminary EA. (Doc. 37 at 4, 6.). The Scratchgravel RAMP implements the following measures to enhance the recreational experience in the Scratchgravel Hills: implements two use-specific trail system; creates zones where mountain bikers must reduce their speed; coordinates with local law enforcement; suggests a potential trail steward; and proposes signage that outlines trail etiquette, penalties for violations, and law enforcement contact information. (BLM-000036, 000169, 000179.) The Scratchgravel RAMP contemplates how to manage the phasing in of the new trails, the retiring of old trails, and the closing of illegal trails. (BLM-000035, 000041.)

BLM assessed a substantial amount of data regarding desired uses, current usage, and trail safety and used this data to create the Scratchgravel RAMP. Plaintiffs fail to show that BLM's assessment of desired uses, safety, and implementation of trails failed to comply with the Butte RMP's directive to provide opportunities for hiking, horseback riding, mountain biking, and hunting. *See Audubon Soc'y,* 40 F.4th at 987 (an agency takes a "hard look" when it reviews a substantial body of

evidence even though the data "contain[s] some gaps, and that a lack of data made certain detailed assessments difficult").

> ### 3. BLM complied with the Butte RMP's directive to collect data and lessen impacts to resources within the Scratchgravel Hills

Plaintiffs argue that BLM failed to comply with the Butte RMP because BLM failed to collect adequate data regarding the Scratchgravel RAMP's impact on resources, such as elk habitat and soil. Transcript of Hearing on Motions, 16:21–17:6 (May 8, 2024); (Doc. 28-1 at 34, 47.) BLM collected information regarding elk habitat within the Scratchgravel Hills, how trail construction and recreational usage impact elk, and how fencing can impact elk through its NEPA process. BLM-000072–74. Montana FWP submitted an untimely public comment regarding elk in response to BLM's Preliminary EA. (Doc. 37 at 10.) A BLM biologist and Montana FWP biologist exchanged emails discussing possible adjustments to the Preliminary EA after BLM received Montana FWP's public comment. (BLM-003043–51.)

BLM ultimately chose Alternative C, which designates 1,590 acres (29% of the Scratchgravel SRMA) to wildlife/non-mechanized zones and implements wildlife friendly fencing to benefit elk. (Doc. 37 at 6–7; BLM-000074.) Alternative C also decreased the number of new trails that will exist within the Scratchgravel Hills. (Doc. 37 at 6.) The record indicates that substantial evidence supports BLM's conclusion that the Scratchgravel RAMP lessens impacts to elk. BLM

communicated with Montana FWP regarding impacts on elk and the studies that BLM consulted further lead the Court to defer to BLM's conclusion. *See Native Ecosystems Council*, 697 F.3d at 1054–55 (citation omitted).

BLM used the soil data that it collected through its NEPA process to assess the erodibility and suitability of the soils within the Scratchgravel Hills. (BLM-000083–89.) BLM recognized that the soils existing within the Scratchgravel Hills generally exhibit characteristics that render them "poor" or "very limited" for hiking, horseback riding, and mountain biking. (BLM-000083, 000085–86.) BLM concluded that the erosion that may occur from recreational use and construction of the new trails would be localized and not degrade the greater environment. (BLM-000089.) The new trails that will be constructed constitute only a small surface area of the Scratchgravel Hills. (BLM-000072, 000089.) The Scratchgravel RAMP permits damaged trails to be closed and it institutes a pre-construction inspection to gauge how to best place and construct new trails. (BLM-000088.)

BLM complied with the Butte RMP's directive while providing recreational opportunities within the Scratchgravel Hills SRMA. The district court in *Klamath Siskiyou Wildlands* analyzed an RMP similar to the Butte RMP. The plaintiffs in *Klamath Siskiyou Wildlands* asserted that BLM had failed to comply with an RMP's requirement to protect soils. 962 F. Supp.2d at 1235. The land at issue was primarily used for timber harvesting. *Id*. at 1232. The district court determined that BLM

"reasonably interpreted the RMP to allow relatively minor loss of soil productivity so long as the Project also includes practices to limit and mitigate such losses." *Id*. at 1235. The Butte RMP similarly requires the BLM to balance the primary uses of the Scratchgravel Hills SRMA, proposed recreation, and the health of the ecosystem. (BLM-000019, 000279, 000281.) The Final EA indicates that expected erosion to trails would be localized due to the small amount of surface area the new trails would cover. The Final EA also indicates that pre-construction inspections will be used to manage "site-specific soil concerns," and it permits trails to be closed when necessary to manage erosion. (BLM-000045, 000074, 000088, 000169.) BLM reasonably interpreted the Butte RMP's directive to permit minimal soil erosion by including measures that will address soil concerns as the trails are constructed. *See Klamath Siskiyou*, 962 S. Supp.2d at 1235.

### B. BLM accounted for the principles of multiple use

Plaintiffs argue that BLM failed to account for the principles of multiple use because BLM does not assess the environment impacts and did not consider horseback riding use of the Scratchgravel Hills. (Doc. 28-1 at 25, 30.) The multiple use mandate requires an agency to "weigh competing interests, and where necessary, make judgments about incompatible uses; a particular parcel need not be put to all feasible uses or to any particular use." *Nat'l Mining Ass'n v. Zinke*, 877 F.3d 845, 872 (9th Cir. 2017) (citing *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,

565 F.3d 683, 710 (10th Cir. 2009)). Multiple use management proves to be "a deceptively simple term that describes the enormously complicated task of striking a balance among" many competing interests. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 58 (2004) (citation omitted). "[T]he principle of multiple use confers broad discretion on an implementing agency to evaluate [competing interests]." *See Nat'l Mining Ass'n*, 877 F.3d at 872.

The Court finds that BLM adhered to the principles of multiple use. BLM first collected data regarding environmental impacts, safety, usage, and desired outcomes from a variety of interested stakeholders through its NEPA process as discussed above. BLM then assessed this data to develop the Scratchgravel RAMP. BLM concluded the following measures proved adequate to account for user safety and optimizing recreational experiences within the Scratchgravel Hills: two use-specific trail systems; zones where mountain bikers must reduce their speed; coordination with local law enforcement; a potential trail steward; and signage that outlines trail etiquette, penalties for violations, and law enforcement contact information. (BLM-000036, 000169, 000179.) BLM concluded the following measures proved adequate to reduce the impact to resources within the Scratchgravel Hills: implement wildlife friendly fencing; increase the wildlife/non-mechanized zone to encompass 1,590 acres; decrease the number of new trails from 40 miles to 35 miles; and implement pre-trail construction inspection and trail closure procedures. (BLM-000045,

28

000074, 000088, 000169.) The record indicates that BLM assessed how the recreational plan implemented by the Scratchgravel RAMP may impact environmental resources, such as soil and elk habitat. BLM adhered to the principle of multiple use. *See Nat'l Mining Ass'n*, 877 F.3d at 872–73.

## V.   Federal Advisory Committee Act

FACA governs when a group proves to be an "advisory committee." 5 U.S.C. § 1001–1014. FACA imposes certain requirements and uniform standards upon an advisory committee. *Pub. Citizen v. U.S. Dep't of Just.*, 491 U.S. 440, 446 (1989). A group constitutes an advisory committee when the group is "established or utilized by one or more agencies, in the interest of obtaining advice or recommendations . . ." 5 U.S.C. § 1001(2). "[A]n entity formed privately, rather than at the Federal Government's prompting . . . an entity in receipt of no federal funds and not amenable to the strict management by agency officials . . . cannot easily be said to have been utilized by a department or agency in the same manner as a Government-formed advisory committee." *Aluminum Co. of Am. v. Nat'l Marine Fisheries Serv.*, 92 F.3d 902, 907 (9th Cir. 1996) (quoting *Public Citizen*, 491 U.S. at 457–58)).

Plaintiffs argue that Grove and the recreationalists and homeowners whom Grove surveyed constitute an advisory committee that should have adhered to the regulations within FACA. (Doc. 28-1 at 49). Grove and the recreationalists and homeowners whom he surveyed fail to meet the characteristics of an advisory

committee. Grove conducted the survey and developed the Grove Proposal through private efforts. (Doc. 37 at 3.) Grove received no funding from BLM to develop the Grove Proposal. (*Id.*) Plaintiffs provide no evidence to demonstrate that BLM strictly managed Grove when he produced the Grove Proposal.

The district court in *Washington Legal Found. v. United States Sentencing Comm'n* determined that the DOJ's relationship to the United States Sentencing Commission did not rise to the level of strict management by the United States Sentencing Commission. 17 F.3d 1446, 1451 (D.C. Cir. 1994). The district court recognized that DOJ would exert significant influence on the United States Sentencing Commission through its members on the United State Sentencing Commissioner's Advisory Group. *Id.* The district court nevertheless concluded that "influence is not control," and that the DOJ did not control the Advisory Group when the Advisory Group ultimately answered to the United States Sentencing Commission. *Id.*

Grove, like the DOJ, had "every reason" to participate and try to persuade BLM to use the Grove Proposal. *Id.* BLM's encouragement, in the form of communications with Colin during BLM's planning process, may have influenced Grove to continue his private efforts. This encouragement by BLM does not rise to the level of "utilization" under FACA. *See id.*

**CONCLUSION**

BLM has made a sufficient showing to demonstrate that it complied with NEPA because it assessed the environmental impacts and recreational usage occurring within the Scratchgravel Hills when it developed the Scratchgravel RAMP. The Grove Proposal constituted a single data point that BLM consulted when it developed the Scratchgravel RAMP. BLM used the data that it collected through the NEPA process to adhere to the Butte RMP's directive to optimize recreation and lessen impacts to resources within the Scratchgravel Hills. BLM also adhered to the principle of multiple use by assessing how the Scratchgravel RAMP can provide recreation to a variety of users. BLM adhered to FACA because Grove and the recreationalists and homeowners whom he surveyed did not constitute an advisory committee and the regulations within FACA were not applicable.

Accordingly, **IT IS ORDERED:**

Plaintiffs' Motion for Summary Judgment is **DENIED**. Defendants' Motion for Summary Judgment is **GRANTED**.

**DATED** this 1st day of July, 2024.

_____

Brian Morris, Chief District Judge
United States District Court